T.C. Memo. 2012-104

UNITED STATES TAX COURT

JERALD W. WHITE AND CLAUDIA K. WHITE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DIOGENES HOLDINGS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 22514-07, 22515-07.          Filed April 11, 2012.

<u>David E. Price</u> and <u>Adria S. Price</u>, for petitioners.

<u>Thomas A. Dombrowski</u>, <u>Anne W. Durning</u>, and <u>Roger P. Law</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>: These cases were consolidated for the purposes of trial,
briefing, and opinion.

Respondent determined deficiencies and accuracy-related penalties under section 6662(a)[1] with respect to petitioners' Federal income taxes as follows:

Jerald W. and Claudia K. White
docket No. 22514-07

| Year | Deficiency | Accuracy-related penalty Sec. 6662(a) |
|------|-----------|---------------------------------------|
| 2001 | $77,600 | $15,520.00 |
| 2002 | 77,200 | 15,440.00 |
| 2003 | 294,777 | 58,955.40 |

Diogenes Holdings, Inc.
docket No. 22515-07

| Year | Deficiency | Accuracy-related penalty Sec. 6662(a) |
|------|-----------|---------------------------------------|
| 2001 | $61,635 | $12,327.00 |
| 2002 | 61,453 | 12,290.60 |
| 2003 | 61,840 | 12,368.00 |

The deficiencies result from respondent's disallowance of deductions claimed by Diogenes Holdings, Inc. (Diogenes), for contributions to the xélan Welfare Benefit Trust (xélan 419 plan) in 2001 and 2002 and to the Millennium Multiple Welfare Benefit Trust (Millennium plan) in 2003, and respondent's

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

determination that Dr. Jerald W. White (Dr. White) and Claudia K. White (Mrs. White) must include the amount of the contributions in their income. Respondent also determined that Dr. and Mrs. White must include the "full value" of "the arrangement" in their income for 2003 when the xélan 419 plan terminated and the assets in the xélan 419 plan were available for distribution.[2]

The issues we are asked to decide are:

(1) whether Diogenes' contributions to the xélan 419 plan in 2001 and 2002 and to the Millennium plan in 2003 are deductible;

(2) whether Dr. and Mrs. White  must include in their income for 2001, 2002, and 2003, respectively, the contributions Diogenes made to the xélan 419 plan in 2001 and 2002 and to the Millennium plan in 2003;

(3) whether Dr. and Mrs. White must include in their 2003 income, under section 402(b)(2), an additional $642,220 because when the xélan 419 plan

---

[2]Respondent gave three alternative reasons for the disallowance of the deductions Diogenes claimed for the contributions to the xélan 419 plan and the Millennium plan:  (1) the contributions were not ordinary and necessary business expenses under sec. 162; (2) the contributions were limited by and subject to the rules of sec. 404(a)(5); and (3) the arrangement is a welfare benefit fund to which the exceptions under sec. 419A(f)(6) do not apply.  Respondent gave alternative reasons for requiring Dr. and Mrs. White to include the contributions to the xélan 419 plan and the Millennium plan in their income:  (1) the contributions were constructive dividends to Dr. and Mrs. White under secs. 301 and 61, and (2) the contributions were compensatory and includible in income as an economic benefit under sec. 61.

terminated in 2003, the insurance policies held by the xélan 419 plan were distributable to Dr. and Mrs. White; and

(4) whether petitioners are liable for accuracy-related penalties under section 6662(a) for substantial understatements of income tax, or, alternatively, negligence or disregard of rules and regulations.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the second and third supplemental stipulations of facts are incorporated herein by this reference.

Background

### Dr. and Mrs. White and Diogenes

At the time the petitions were filed Dr. and Mrs. White resided in Tennessee, and Diogenes' principal place of business was in Tennessee.

Dr. White has practiced medicine in Tennessee since 1974. Dr. White is the sole owner and provides medical services as an employee of Brownsville Medical Clinic, P.A. (Brownsville Medical), a C corporation. Brownsville Medical owns and operates three medical facilities: Brownsville Medical Clinic, Brownsville, Tennessee; the Medical Clinic of Alamo, Alamo, Tennessee; and Old Hickory

Family Medicine, Jackson, Tennessee. Dr. White practices medicine at all three locations.

Mrs. White is a registered nurse licensed in Tennessee. She practices nursing at the clinics operated by Brownsville Medical.

Dr. White's daughter Margaret White Nelson (Margaret) was born in 1964. Margaret obtained a medical degree from the University of Tennessee Medical School in 1991 and since 1996 has worked as a pediatrician practicing medicine at Cincinnati Children's Hospital and at a pediatric clinic in Cincinnati. Margaret occasionally performs services as a doctor at one of the clinics owned by Brownsville Medical.

Dr. and Mrs. White have a son, Eric Bristol White (Eric), who was born in 1984. Eric was 15 years old in 1999. Eric became a licensed pharmacy technician in Tennessee in 2005.

During the years at issue Dr. and Mrs. White owned several other corporations. Dr. White owned 67% and Mrs. White owned 33% of the shares of Brownsville Apothecary, Inc. (Brownsville Apothecary), a C corporation. Mrs. White owned 51% of the shares of Cost Plus Pharmacy, Inc. (Cost Plus), an S corporation, and Margaret and Eric each owned 24.5%. Brownsville Apothecary and Cost Plus have had very little employee turnover.

Diogenes was incorporated in Tennessee on August 13, 1999. Dr. White owns 100% of the shares of Diogenes, and is its president. Mrs. White is Diogenes' secretary/treasurer.

On August 29, 1999, Diogenes entered into a management agreement with Brownsville Medical (including Brownsville Medical Clinic, Medical Clinic of Alamo, and Old Hickory Family Medicine) and Brownsville Apothecary. The agreement states that Diogenes "agrees to furnish advisory and management expertise in all aspects of business to the above."

For the years at issue Dr. and Mrs. White reported the following relevant amounts on their jointly filed Federal individual income tax returns:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Gross income | $1,418,560 | $1,115,707 | $1,142,511 |
| Itemized deductions | 122,512 | 110,429 | 27,462 |
| Taxable income (loss) | 1,296,048 | 1,005,278 | 1,115,049 |
| Income tax | 478,797 | 358,773 | 350,805 |

Brownsville Medical reported the following relevant amounts on its Federal income tax returns:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Total income[1] | $2,527,967 | $2,316,241 | $2,137,828 |
| Less: Total deductions | 2,569,771 | 2,274,031 | 2,138,283 |
| Taxable income | (41,804) | [2](223) | (455) |

[1]Gross receipts less cost of goods sold.
[2]Amount includes deductions for net operating loss from 2001.

Included in total deductions for Brownsville Medical were the following relevant items:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Compensation of officers | $792,546 | $444,397 | $295,000 |
| Salaries and wages | 958,633 | 1,054,676 | 1,077,034 |
| Pension, profit-sharing, etc., plans | 71,345 | 69,323 | 72,785 |
| Employee benefit programs | -- | -- | -- |
| Consultant fees | 235,000 | 234,076 | 237,500 |

Brownsville Apothecary reported the following relevant amounts on its income tax returns:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Total income[1] | $719,437 | $741,101 | $881,557 |
| Less: Total deductions | 702,992 | 741,037 | 882,456 |
| Net operating loss carryover | 19,825 | 3,380 | 3,316 |
| Taxable income | ( 3,380) | (3,316) | (4,215) |

[1]Gross receipts less cost of goods sold.

Included in total deductions were the following relevant items:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Compensation of officers | $379,000 | $411,400 | $500,000 |
| Salaries and wages | 108,213 | 125,266 | 138,663 |
| Pension, profit-sharing, etc., plans | 27,299 | 22,731 | 21,789 |

| | | | |
|---|---|---|---|
| Employee benefit programs | -- | -- | -- |
| Consultant fees | 99,000 | 90,453 | 101,000 |

For the years at issue Diogenes reported the following relevant amounts on its Federal corporate income tax returns:

| | 2001 | 2002 | 2003 |
|---|---|---|---|
| Total income | $302,228 | $300,980 | $300,601 |
| Compensation of officers | 45,000 | 45,000 | 90,000 |
| Salaries and wages | -- | -- | -- |
| Pension, profit-sharing, etc., plans | -- | 200,000 | -- |
| Employee benefit programs | 200,000 | -- | 200,000 |
| Total deductions | 300,621 | 300,130 | 298,142 |
| Taxable income (loss) | 1,607 | 850 | 2,459 |
| Income tax | 241 | 128 | 369 |

## Tax Preparers

Kenneth Cozart is a Tennessee certified public accountant (C.P.A.) practicing with the firm Kenneth Cozart & Associates. Mr. Cozart has been providing accounting services to Dr. and Mrs. White since 1976. Mr. Cozart prepared Dr. and Mrs. White's Forms 1040, U.S. Individual Income Tax Return, Brownsville Medical and Brownsville Apothecary's Forms 1120, U.S. Corporation Income Tax Return, and Cost Plus' Forms 1120S, U.S. Income Tax Return for an S Corporation, for years 1998 through 2006.

Morris A. Goldstein (M. Goldstein) and Sidney Goldstein (S. Goldstein) are Tennessee C.P.A.s practicing with the firm Goldstein & Associates. Diogenes used Goldstein & Associates to prepare its 1999 through 2003 corporate income tax returns. M. Goldstein signed Diogenes' Form 1120 for each of the years 1999 through 2003 as the paid preparer.

xélan

xélan, the Economic Association of Health Professionals, Inc. (Economic Association), was founded more than 30 years ago by L. Donald Guess as a membership organization for doctors. The Economic Association was part of a family of companies (xélan) which provided its members with a variety of insurance products offered by established companies as well as group supplemental insurance programs (e.g., disability, long-term care, malpractice) designed specifically for its members. The name "xélan" was adopted for the Economic Association in 1974 "combining 'x', the individual's savings required to finance lifestyle costs through life expectancy, with 'élan', the French word meaning a lifestyle of personal freedom."

Members of the xélan family included: the Economic Association; xélan, Inc.; the xélan Foundation, Inc.; xélan Investment Services, Inc.; xélan Pension Services, Inc.; Pyramidal Funding Systems, Inc., d.b.a. xélan Insurance Services;

xélan Financial Planning, Inc.; and xélan Administrative Services, Inc. Doctors wishing to participate in xélan's programs would become members of the Economic Association by paying an initial $975 enrollment fee and an annual membership fee of $275. xélan provided its members with financial services through a network of financial counselors.

The xélan programs, services, and products, in pertinent part, included a service entitled the "xélan Tax Reduction Programs (Capital Accumulation and Distribution Phases)". There were three areas of emphasis under the xélan Tax Reduction Program, namely: Income Tax Reduction; Capital Gains Tax Elimination; and Estate Tax Elimination. Dr. and Mrs. White became involved with two products offered under the Income Tax Reduction program, the Disability Equity Trust[3] and the xélan 419 plan.

---

[3]Between 1999 and 2004 Diogenes deducted $204,000 in payments made to the xélan Disability Equity Trust for Dr. White as follows:

| Year | Deduction |
|------|-----------|
| 1999 | $50,000 |
| 2000 | 50,000 |
| 2001 | 50,000 |
| 2002 | 50,000 |
| 2003 | -0- |
| 2004 | 4,000 |

(continued...)

The xélan 419 Plan

The xélan 419 plan was established in 1997 with a trust agreement dated December 5, 1997, and was designed to be a "10 or more employer plan" within the meaning of sections 419(e)(1) and 419A(f)(6)(B).  xélan's promotional materials described the xélan 419 plan as:

> [A]n employee welfare benefit plan providing severance pay and pre-retirement death benefits to "C" corporation employees through an institutionally trusteed multiple employer trust.  * * *  The funding vehicle for the [xélan] 419 Plan is a specially designed life insurance investment contract that meets the minimum death benefit corridor requirement exceeding contract cash accumulations necessary to qualify the contract for tax free earnings on cash accumulations.  The [xélan] 419 plan is usually administered as a 5-year funding plan and annual, deductible contributions of up to 40% of corporate earnings for 5 years are permitted.

The xélan 419 plan was amended and restated on December 30, 1999, effective January 1, 1999.  The amended and restated xélan 419 plan retained the following pertinent definitions:

> (A)    "Annual Compensation" means the total of all compensation, reported as wages, tips, and other compensation on an Employee's Form W-2, but excluding the value of any Employer-

---

[3](...continued)
The Internal Revenue Service (IRS) examined income tax returns of participants in the xélan Disability Equity Trust, including the returns of Dr. and Mrs. White and Diogenes for 2001 through 2003, with respect to participation in the program.  The IRS, Dr. and Mrs. White, and Diogenes entered into a closing agreement resolving the issue pertaining to the xélan Disability Equity Trust.

provided taxable fringe benefits.  For Shareholder Employees, however, Annual Compensation means net practice income.

       \*       \*       \*       \*       \*       \*       \*

     (E)     "Employee" means any person who is employed by and receives Annual Compensation from the Employer.  Employee includes within its meaning a Shareholder-Employee.

     (F)     "Employer" means a corporate business entity which has at least one employee other than a Shareholder-Employee and executes a Participation Agreement to participate in the Trust.

       \*       \*       \*       \*       \*       \*       \*

     (I)     "Hours of Service" means and shall include each hour for which an Employee is directly or indirectly paid, or entitled to payment, for the performance of duties for the Employer.

       \*       \*       \*       \*       \*       \*       \*

     (K)     "Participant" means an Employee who meets the eligibility requirements set forth in this Trust.

       \*       \*       \*       \*       \*       \*       \*

     (O)     "Shareholder-Employee" means any employee or officer of a Corporation who owns or is attributed as owning within the meaning of §318(a)(1) of the Code, during the taxable year of such Corporation, more than five percent of the outstanding stock of the Corporation.

       \*       \*       \*       \*       \*       \*       \*

     (Q)     "Termination Date" means the date the Employer terminates its participation in the Trust in accordance with Article III. B.

- 13 -

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(V)   "Year of Service" means 1,000 Hours of Service, or more, in a Trust Year.  For purposes of determining an Employee's eligibility to participate, service with the Employer by an Employee prior to the Employer's Entry Date shall be counted.

Participation

According to the amended trust agreement, in order to participate in the xélan 419 trust "an Employer must (a) execute the Participation Agreement, (b) be approved as an participating Employer by the Trust Administrator, and (c) obtain a legal opinion from tax counsel, the form and content of which must be acceptable to Xélan, regarding the tax consequences of participating in the Trust."

Contributions

According to the amended trust agreement the amount of an employer's contribution to the xélan 419 plan for each trust year depended on the amounts of the severance and death benefits provided by the employer for its participants, the funding level provided to the employer by the trust administrator, and the amount of an annual premium charged by the insurance company selected by the trust administrator for an individual life insurance policy on the life of each participant. Once an employer identified to the trust administrator the employees who were eligible to participate in the xélan 419 plan "the Trustee will make an application

with an insurance company selected by the Trust Administrator for policies of

interest sensitive whole life (with a return of cash value rider attached) or universal

life insurance (with Option B Rider attached) on the life of each eligible Employee."

An employer's contribution for each trust year was the sum of the premiums paid

for the individual life insurance policies purchased by the trustee. Once the

contribution amount was established, the annual contribution for each employer did

not change unless the employer changed the benefits, added participants, or dropped

participants.

In its Program Summary xélan further explained that

> Contributions must also be provided on an annual basis for eligible rank and file employees. Rank and file contribution costs are usually less than 10% of the employer's contributions so long as there are less than 10 rank and file employees eligible to participate in the plan. If there are 10 or more other employees in the doctor's employer corporation that are eligible to participate, the [xélan] 419 Plan is usually not efficient as a retirement plan. In some situations when a doctor's employing corporation has more than 10 other employees, the doctor can sometimes be incorporated individually. The doctor's personal corporation then receives compensation under a contract for services from the original employing corporation that has a large number of "other employees". Under this approach doctors can receive their share of corporate earnings under a contract for services between the original employing corporation and the doctor's new 100% owned "C" corporation employer. The self-incorporated doctor needs at least one other employee for his or her "C" corporation to adopt a [xélan] 419 Plan. The other employee may be the spouse of the self-incorporated doctor. * * *

Termination

The amended trust agreement further provides that an employer's participation in the xélan 419 plan will terminate if: (1) the employer fails to make any required contributions or has otherwise failed to abide by the terms of the trust; (2) the employer provides written notice to the trustee of the employer's intent to withdraw from the trust; (3) xélan, by action of its board of directors, determines to terminate the trust; or (4) the employer or any other party files a petition for relief under chapter 7 of the United States Bankruptcy Code.

An individual employee's participation in the xélan 419 trust terminates upon: (1) the employer's termination of its participation; (2) the death of the employee; (3) the employee's cessation of employment for any reason, whether voluntary or involuntary, including disability; or (4) the date the employee attains age 62.

xélan's Program Summary touted that

> An employer corporation has the right to terminate its participation in the multiple employer trust at any time. When an employer terminates participation, covered employees are eligible to receive distributions of their accounts of accumulated cash in the trust, or to purchase the life insurance investment contracts funding the employee's plan benefits from the trustee through administrative procedures defined in the plan document. If a participant elects the administrative option to purchase the life insurance investment contract funding their benefits from the trustee, they receive a life

insurance investment contract containing cash accumulations that qualifies as a "non modified endowment contract". Non modified endowment status permits loans from the contract to the owner to be received by the owner without current income taxation. The life insurance investment contract also contains a "wash loan" provision that reduces interest costs on these loans to the borrower to zero. Upon the death of the borrower, the loans from the insurance contract are repaid to the insurance company from the income tax free death benefit component of the contract. A portion of the tax free IRC 101(a) death benefit of the contract equal to the loan balance borrowed by the doctor is paid to the lender (the insurance company) as a collateral assignee. Any death benefit exceeding the loan repayment is also received by named beneficiaries of the contract as income tax free death benefit under IRC 101(a).

xélan's Lawyers

Initially, Attorney Brant Freer, of the Detroit law firm of Miller Canfield, advised xélan with respect to the xélan 419 plan and provided legal opinions to participants until about February 1999. Beginning in or about March 1999 the law firm Williams Coulson Johnson Parker Lloyd & Tedesco L.L.C. (Williams Coulson), of Pittsburgh, Pennsylvania, became legal counsel for the xélan 419 plan.

Michael E. Lloyd, one of the founding partners of Williams Coulson, is an attorney holding a juris doctor from the University of Pittsburgh and a master of laws (taxation) from Georgetown University Law Center. Before his association with Williams Coulson, Mr. Lloyd served as a senior tax attorney for the Office of

Associate Chief Counsel, Employee Benefits and Exempt Organizations of the Internal Revenue Service. Mr. Lloyd participated in xélan-sponsored conferences for xélan financial counselors, xélan advisory board members, client doctors, and special guests. While at Williams Coulson, Mr. Lloyd provided xélan with advice concerning, among other things, the xélan 419 plan. Mr. Lloyd provided legal opinions for participants in the xélan 419 plan and the xélan Supplemental Disability Trust. Mr. Lloyd did not provide advice regarding or review the insurance products selected by the xélan 419 plan, nor did he review or consider the employee census submitted by employers to ascertain whether the employers were in compliance with the xélan 419 plan requirements before issuing the opinion.

Typically, whenever a new participant signed up for participation in the xélan 419 plan, xélan would request a legal opinion for the participant from Williams Coulson. Upon receipt of the information from xélan, Williams Coulson would prepare an opinion letter addressed to the participant of the xélan 419 plan. The opinion letters were based upon general facts and assumptions; if the facts and assumptions were not as stated in the letter, then the opinion and conclusions would not apply. If xélan asked, Williams Coulson would backdate opinion letters to make it appear that the letters had been issued in a prior tax year.

Promotion of the xélan 419 Plan

xélan solicited new clients for its products by mailing promotional flyers to doctors and by inviting them to attend xélan seminars. At the seminars attendees heard presentations, were given sales promotional materials, and "received recommendations for 'doctors only' tax, asset protection and investment management programs that prevent losses to unnecessary taxes". As part of the seminar participants completed a xélan Loss Test which was used to identify which xélan products and programs would be most appropriate for the participant's use. The promoters indicated that one of the key aspects of the xélan program was that it "eliminates income taxes on earnings other that [sic] what you need to live on."

The philosophy and programs xélan offered were extensively promoted via brochures and other promotional materials. xélan maintained a Web site, http://www.xelan.com, which contained additional information about its organization, philosophy, personnel, and programs. The mechanics and philosophy of xélan were further explained via audio and video tapes provided to its members. Many of the promotional materials touted that "In 1975 the first xélan Financial Counselors were recruited and trained to implement the xélan annual written plans for doctors. These xélan Tax Reduction Plans created

individualized financial structures that limited doctors' income tax losses to lifestyle cost needs and allocated remaining pre-tax surplus earnings to deductible savings plans."

xélan marketed the xélan 419 plan as part of its tax reduction program. The tax reduction program consisted of two phases: (1) the capital accumulation phase; and (2) the capital distribution phase. During the capital accumulation phase of the tax reduction program, xélan recommended:

> (1) that xélan clients ideally become employees of "C" corporations; (2) that annual taxable compensation be set at lifestyle needs plus income taxes; (3) that annual pre-tax surplus practice or business income be accumulated incrementally during the course of each tax year in a corporate or personal savings account that earns the $100,000 CD rate; (4) that the accumulated annual corporate or personal pre-tax surplus be allocated prior to 12/31 to one or more of the deductible savings plans available through the xélan Program to employees of "C" corporations: the 419 Plan, the Leveraged Split Dollar Plan, the Disability Equity Trust, the Long Term Care Equity Trust, the Malpractice Equity Trust, the Family Public Charity xélan Foundation, and/or a Qualified Retirement Plan. * * *

xélan's Program Summary described the xélan 419 plan as not only a convenient method to reduce current taxable income while providing life insurance, but also as a retirement investment vehicle. At the seminars the xélan 419 plan was described as a "non-qualified retirement plan". xélan's Program Summary states:

The significant economic and tax advantages of these specially designed insurance industry "non modified endowment" investment and death benefit contracts, as compared to traditional qualified retirement plans, is the tax free receipt by the owners of retirement funding distributions, the tax free receipt by the lender of death benefit proceeds equal to the contract loans, and tax free receipt by named beneficiaries of the leveraged death benefit proceeds exceeding contract loans. The 419 Plan distributions may be administered pursuant to the plan agreement so that they are received by the insurance investment contract owners in the form of tax free and interest free loans. At the death of the contract owner, any funds borrowed from the contract to finance lifestyle costs are repaid to the insurance company lender with a portion of the tax free death benefit. Unborrowed contract reserves actuarially guarantee a death benefit for doctors' family members that exceeds any loan balance borrowed for retirement spending purposes by the doctor during the doctor participant's lifetime. At the death of the doctor-owner-insured, tax free death benefits are provided to surviving family members, or other named beneficiaries including charitable institutions. * * *

* * * * * * * *

419 Plans provide approximately 150% greater spendable retirement distributions from age 65 to age 85 than for equally funded qualified retirement plans for 35 year old participants, approximately 140% greater spendable retirement distributions than for equally funded qualified retirement plans for 45 year old participants, and approximately equal spendable retirement distributions for 55 year old participants making at least five years of annual contributions to the plan. * * *

Dr. and Mrs. White's Involvement With xélan

By 1999 Dr. White's medical practice had become very lucrative. Dr.

White learned about xélan in 1999 when he attended a xélan seminar conducted by

David Cline, a xélan financial counselor and Indianapolis Life insurance agent with an office in Tennessee. At the time Dr. White was 53 years old and Mrs. White was 47. Mr. Cline represented himself to Dr. and Mrs. White as a C.P.A. and a certified financial counselor and as holding a master of business administration degree. On the basis of the information that Dr. White obtained after he began to participate in the xélan 419 Plan, he now questions Mr. Cline's professional credentials.

On March 5, 1999, Mr. Cline sent to Dr. White a letter regarding his attendance at the xélan seminar and the need to schedule a meeting to create a xélan tax reduction plan for Dr. White. Dr. White met with Mr. Cline on June 16, 1999, to discuss Dr. White's financial needs and the possibility of joining the Economic Association. Dr. White indicated his interest in the disability equity trust and the xélan 419 Plan. Dr. White's notes from the June 16, 1999, meeting with Mr. Cline indicate that Dr. White understood the xélan 419 plan to require five years of contributions with a "draw out" in the seventh year. After his initial meeting with Dr. White, Mr. Cline included S. Goldstein, of Goldstein & Associates, in the financial planning meetings with Dr. and Mrs. White.

On June 30, 1999, Dr. and Mrs. White met with Mr. Cline and Morris Loskove (who represented himself as a retired economics professor at the

University of Memphis) at Dr. White's office to further discuss financial planning. Dr. White was interested only in the disability equity trust and the xélan 419 plan because he was interested only in disability and life insurance. At the meeting Dr. White, on behalf of Diogenes, which had not yet been incorporated, agreed to participate in the xélan Disability Equity Trust and the xélan 419 plan. Dr. White became a member of the Economic Association, designating Mr. Cline as his xélan financial counselor. Dr. White created and incorporated Diogenes at the recommendation of Mr. Cline and S. Goldstein.

Participation in the xélan 419 Plan

Diogenes was not incorporated until August 13, 1999. Nevertheless, on June 30, 1999, Dr. White signed a "Corporate Resolution and Application to Participate in the xélan Welfare Benefit Trust Program" (application) and provided a "Confidential Employee Census Data" form (census form). Diogenes initially committed to fund the program for at least five years at a fixed amount of $218,000 per year and to pay xélan a $600 annual administration fee for as long as it participated in the plan. As part of the application xélan was paid $2,500, which included a one-time setup fee of $1,900 and a first year administration fee of $600.

On the census form the following individuals were identified as Diogenes employees as of June 30, 1999:

| Name | Date of birth | Hire date[1] | W-2 Wages | Hours worked |
|------|---------------|-----------|-----------|--------------|
| Dr. White | 11/7/45 | 1973 | $700,000 | 2,000 |
| Mrs. White | 3/14/51 | 1976 | 118,000 | 2,000 |
| Margaret | 9/6/64 | 1997 | 5,000 | 1,000 |
| Eric | 5/12/84 | 1994 | 12,000 | 1,200 |

[1]Diogenes was not incorporated until 1999. Eric was 10 years old in 1994.

From 1999 through 2003 Dr. White never had wages of $700,000 and Mrs. White never had wages of $118,000 as employees of Diogenes. Neither Margaret nor Eric ever worked 1,000 or 1,200 hours, respectively, for Diogenes. For the years 2001, 2002, and 2003, Diogenes paid Dr. White wages of $15,000, $15,000, and $30,000, respectively, and paid Mrs. White wages of $30,000, $30,000, and $60,000, respectively. Neither Margaret nor Eric received any wages from Diogenes during the years at issue.

Included in the setup fee was the cost of a tax opinion letter. On June 30, 1999, Dr. White signed a "Certificate of Diogenes Holdings, Inc." (certificate) in order to obtain a legal opinion from Williams Coulson regarding the tax consequences and risks associated with participating in the xélan 419 plan. In the certificate Dr. White represented, among other things, that the salaries of the employees of the corporation would not be reduced because of the participation in the xélan 419 plan.

On August 11, 1999, the xélan 419 plan sent a letter to Dr. White confirming Diogenes' payment of the setup fee and its commitment to fund the program for at least five years in the amount of $218,000 per year. Enclosed with the August 11, 1999, confirmation letter was a legal opinion from Mr. Lloyd to Dr. White dated July 9, 1999, regarding the xélan 419 plan. In the legal opinion from Mr. Lloyd, Dr. White was advised that "The Opinions are directed solely to Xélan and may be relied upon only by Xélan except that as part of our engagement with Xélan, we have agreed to provide a copy of the Opinions to you in the form of this letter" and that "The Opinions provided in this letter are based on the general fact pattern described below and documents which were provided to us by Xélan. Accordingly, these opinions may not apply to your company to the extent that your circumstances or the documents are different then those described below." Mr. Lloyd concluded the opinion letter by advising Dr. White to call him if he had "any questions regarding the application of the matters discussed in this letter to your specific case". Dr. White did not contact Mr. Lloyd or Williams Coulson and did not separately engage them or any other legal counsel to provide a legal opinion for Diogenes. Dr. White did not compare the fact patterns described in the opinion letter with the actual fact patterns of his business, and he sought counsel from neither his former attorney, Larry Banks, nor his longtime C.P.A., Ken

Cozart. Rather, Dr. White relied "exclusively" upon the advice received from Mr. Cline and S. Goldstein. On the advice of Mr. Cline, Dr. White used Goldstein & Associates to prepare Diogenes' corporate tax returns for 1999 through 2003.

On August 11, 1999, the xélan 419 plan sent to Dr. White a letter containing a Summary Plan Description. The Summary Plan Description explained the provisions of the xélan 419 plan, including a requirement that employees be age 21 with one year of service to be eligible to participate in the xélan 419 plan.

Dr. White subsequently reduced Diogenes' annual funding commitment to the xélan 419 plan to $200,000. On or about November 11, 1999, Mrs. White signed a $200,000 check from Diogenes to the xélan 419 plan to fund Diogenes' first year commitment to the program. On November 16, 1999, the xélan 419 plan sent Dr. White a letter confirming Diogenes' payment and requesting that he execute a new Corporate Resolution reflecting the change in a contribution amount to $200,000 per year. Mrs. White signed the new Corporate Resolution reflecting the annual commitment of $200,000.

As part of the xélan 419 plan, applications to Indianapolis Life were prepared for Dr. and Mrs. White on June 30, 1999, requesting the issuance of policies on each of them using an insurance product known as the Executive VIP policy. The Executive VIP policy is "an excess interest whole life plan" with its

principal strategy such that the policy "is initially purchased and owned by an entity other than the insured--usually an employer or pension plan" and later "transferred to the insured by gift or by sale."

According to Indianapolis Life, the Executive VIP policy is targeted to executives, professionals, and business owners to address customer needs for tax-favored retirement funds and for "[u]nlocking corporate retained earnings." The Executive VIP policy purports to provide a "[m]inimum fifth-year cash value to minimize tax on ownership transfer" together with "[s]trong tenth-year cash value". The policies were designed with a nine-year surrender charge period. However, mortality and expense charges increase significantly in the eleventh year, and, therefore, the Executive VIP policy provides for the exchange of the policy after the 10th year without new evidence of insurability and without fees or sales expense deductions from the cash value of the new policy. After an exchange the new policy is a universal life policy and any existing loans are automatically transferred. Following an exchange the loan values of the new policy are available "without surrender charges, should you later choose to make systematic withdrawals to provide retirement income."

The Executive VIP policies were front loaded with high surrender charges to artificially suppress the value of the policies and designed specifically as investment

vehicles to be used to build cash accumulations.  Indianapolis Life described how

the Executive VIP policy works as follows:

> Generally, a policy will be purchased and owned by a
> corporation or individual which will pay premiums for five years.  At
> the end of the fifth year, the policy will be transferred or sold to the
> insured or another entity.  The recipient is responsible for any tax
> liability which may be generated on the value of the policy at the time
> of receipt.  (Relatively speaking, this value will be minimal.)

> Policy values may be used to pay premiums for the next five
> years, if the policy has sufficient values (changes in current interest
> rates, monthly expense and mortality charges may require additional
> out-of-pocket premiums to keep the policy in-force).  At the end of the
> policy's tenth year, it is exchanged for a universal life policy and these
> values may be used to generate cash flow for retirement, estate
> liquidity or other purposes.

At Dr. White's direction the xélan 419 plan purchased from Indianapolis Life

insurance policies in the following amounts:

| Participant | Premium | Face amount |
|---|---|---|
| Dr. White | $175,326.69 | $2,733,500 |
| Mrs. White | 23,693.82 | 460,790 |
| Margaret | 423.00 | 25,000 |
| Eric | 556.00 | 58,575 |

The amount of insurance coverage purchased through the xélan 419 plan was

computed on the amount Dr. White had determined he wanted to contribute to the

xélan 419 plan, $200,000, and the relative amounts of insurance Dr. White wished

to purchase for each of his family members.  The insurance policies purchased for

Dr. and Mrs. White had face values equal to 3.905 times the amount of W-2 wages listed on the census form signed by Dr. White. The insurance policies purchased for Margaret and Eric had face values equal to approximately five times the amount of W-2 wages listed on the census form. As previously noted, the wages listed on the census form were grossly overstated.

In each of the years 1999, 2000, 2001, and 2002, Diogenes paid $200,000 to the xélan 419 plan and the xélan 419 plan remitted equivalent payments to Indianapolis Life. Diogenes paid xélan the $600 annual administration fee to participate in the xélan 419 plan during 2000, 2001, and 2002 on September 2, 2000, December 26, 2001, and October 12, 2002, respectively.

Diogenes claimed deductions on its Federal corporate income tax returns for the payments it made to the xélan 419 plan as follows:

| Year | Classification of deduction | Amount |
| --- | --- | --- |
| 1999 | Employee benefit programs | $200,000 |
| 2000 | Employee benefit programs | 200,000 |
| 2001 | Employee benefit programs | 200,000 |
| 2002 | Pension, profit-sharing, etc. | 200,000 |

On March 29, 2000, the xélan 419 plan provided Diogenes with an update with respect to the participation in the xélan 419 plan and copies of the first two pages of the insurance policies purchased. On January 30, 2002, and January 6,

2003, the xélan 419 plan provided information about the insurance policies issued on the lives of Dr. and Mrs. White, Eric, and Margaret together with letters notifying each of them of the insurance policies purchased as an employee benefit.

Termination of the xélan 419 Plan

On May 29, 2003, the xélan 419 plan sent a letter to Diogenes and Dr. White informing them that the trust had been terminated effective May 28, 2003 (termination letter). Enclosed with the termination letter were individual letters to Dr. White, Mrs. White, Margaret, and Eric, notifying them of their options as insured participants under the plan. The letters advised them that under the terms of the xélan 419 plan all participants would be given an opportunity to purchase the life insurance policies that were owned on their lives by the trust, and that all policies not purchased would be surrendered. The policy purchase prices for Dr. and Mrs. White, Margaret, and Eric were as follows:

| Name | Purchase price |
|------|----------------|
| Dr. White | $43,794.05 |
| Mrs. White | 7,382.43 |
| Margaret | 400.53 |
| Eric | 938.44 |

By letter dated June 2, 2003, Mr. Cline informed Dr. White that xélan and its management had determined to terminate the xélan 419 plan. Mr. Cline advised Dr.

White that "Since you have already completed 4 years of funding into the 419 Trust, there will be special provisions made to insure that you can complete the entire 5 year funding and also to insure that you will receive all of your anticipated return within the Indianapolis Life policy." As of June 30, 2003, the accumulation value[4] of Dr. and Mrs. White's Indianapolis Life policies was $642,220.87 ($564,655.36 for Dr. White's and $77,565.51 for Mrs. White's). The Indianapolis Life annual report indicates that as of September 15, 2003, the policy on Dr. White's life had a guaranteed cash and surrender value of $127,900.46. The Indianapolis Life annual report indicates that as of September 12, 2003, the policy on Mrs. White's life had a guaranteed cash and surrender value of $16,298.14.

In a memorandum dated June 27, 2003, Mr. Cline advised Dr. and Mrs. White with regard to their options regarding the termination of the xélan 419 plan. Mr. Cline recommended that Dr. and Mrs. White select one of two options: (1) "Purchase the policy from the Xélan Welfare Benefit Trust [($43,794.05 for Dr. White's policy and $7,382.43 for Mrs. White's policy)], pay the taxes on the Trust

---

[4]Accumulation value is defined by Indianapolis Life as "the base premium less the monthly deduction and any partial surrenders, plus interest", whereas the current cash value is defined as "the greater of the guaranteed cash value or the accumulation value less any surrender charge."

Distribution Amount in 2003, and then pay the final year premium for the policy with after-tax dollars"; or (2) "Transfer the policy to the Millennium Trust and pay the final year with tax-deductible dollars and then transfer the policy from the Millennium Trust to Dr. Jerald White [and Mrs. White] after the 5th year of contribution." Mr. Cline noted that under the first option, although Dr. and Mrs. White would initially have to pay additional money to the xélan 419 plan, "Upon receipt, the Trust will redistribute the assets back to the employees within 90 days, so each of you should receive a comparable amount in return plus your insurance contracts and your cash value." The xélan 419 plan's account records indicate that those participants who chose to purchase their policies from the xélan 419 plan after it terminated received distributions from the plan equal to or greater than the amounts they paid for the policies.

Dr. and Mrs. White did not elect to "purchase" the insurance policies acquired through the xélan 419 plan because Dr. White did not trust the people he was dealing with and he wanted to get the benefit of his original deal. Dr. White found it incredible that in order to purchase his policy from the xélan 419 plan he would have to pay them approximately $43,000 just to have them turn around and distribute the same back to him. Rather, Dr. and Mrs. White decided to "transfer" the insurance policies to the Millennium plan because Dr. White felt that it would

allow him to complete the contract he thought he had signed. Dr. and Mrs. White, Margaret, and Eric each signed a "Participant's Voluntary Election and Direction of Plan to Plan Transfer" by which they directed the xélan 419 plan to transfer their insurance policies to the Millennium plan. On September 19, 2003, the xélan 419 plan sent letters to Dr. and Mrs. White, Margaret, and Eric confirming that their requests to transfer their Indianapolis Life policies to the Millennium plan had been processed.

The Millennium Plan

Millennium Marketing Group, L.L.C. (MMG), was formed in 2002 by Norman Bevan[5] and Scott Ridge[6] to sponsor the Millennium plan. Mr. Bevan owns Innovus Financial Solutions, Inc. (Innovus), and has served as its president and chief executive officer. In 2002 Kathleen R. Barrow, an attorney admitted to practice law in Oklahoma in 1992 and Texas in 2002, was hired by Mr. Bevan and Mr. Ridge to provide legal advice regarding a proposed 419 plan. In 2003 Ms. Barrow joined the law firm Whitaker, Chalk, Swindle & Sawyer (Whitaker Chalk) and continued to provide legal advice regarding the Millennium plan.

---

[5]Mr. Bevan is a chartered life underwriter, a chartered financial consultant, and an accredited estate planner.

[6]Mr. Ridge is a chartered life underwriter and a chartered financial consultant.

On March 5, 2004, while employed by Whitaker Chalk, Ms. Barrow authored two opinion letters regarding the Millennium plan. On June 1, 2004, Ms. Barrow became an employee of Innovus and MMG, serving as president and chief counsel in their Houston, Texas, office. In July 2006 Ms. Barrow left the employ of Innovus and MMG, started her own law firm, and continued providing legal advice to the Millennium plan. In March 2007 Ms. Barrow joined the law firm Jackson Lewis LLP as a partner in its Houston, Texas, office.[7]

The Millennium plan was established on November 1, 2002, as a trust under the laws of the State of Mississippi. The Millennium plan provides eligible employees of participating employers with pre- and post-retirement death benefits and other pre- and post-retirement welfare benefits, the latter including medical expense reimbursement, disability benefits, and in certain limited circumstances involuntary severance benefits. In 2003 the plan also provided a benefit in the case of "hardship".

Republic Bank & Trust (Republic Bank) in Norman, Oklahoma, has served as the trustee of the Millennium plan since the plan's inception. The Millennium plan's assets are held by the trustee with the assistance of an independent financial adviser.

_____

[7]At the time of trial Ms. Barrow, Mr. Bevan, and Mr. Ridge were the subjects of an IRS sec. 6700 investigation. Mr. Lloyd represented Ms. Barrow with regard to the sec. 6700 investigation.

The trustee is responsible for functions such as recordkeeping, including maintaining complete and accurate account records for all plan participants, allocating investment earnings, and posting distribution information to participant accounts.

The Millennium plan generally invests participating employer contributions in life insurance policies issued by State licensed A+ A.M. Best rated or better insurance carriers, including Indianapolis Life, to fund the benefits promised under the Millennium plan. All of the life insurance policies are owned and held in trust by the Millennium plan.

The General Product Information Guide (Guide) is a marketing brochure describing the Millennium plan. The Guide indicates that the Millennium plan allows participating employers to fund valuable welfare benefits for employees without having to limit deductions to current costs and to fund pre- and post- retirement death, life, medical, and disability benefits through the Millennium plan and presently deduct contributions for that purpose. Under the Millennium plan "Employers select the employees they want to become participants and they determine the targeted level of Death Benefit and Life Benefits for each participant. Employers choose their investment risk, by selecting the insurance product type (fixed, indexed or equity) to insure the selected benefits."

Under the terms of Diogenes' adoption agreement, the employer would become a covered employer for purposes of the plan upon the last to occur of four events: (1) the third-party administrator received the signed adoption agreement; (2) the board of directors of the employer authorized the execution and delivery of the adoption agreement and the third party administrator received the resolution/consent; (3) the initial contribution or other initial payment was placed into the escrow account; and (4) insurance on the lives of eligible employees was issued to the trust and received by the trustee. To be eligible to become a participant in the Millennium plan an employee must satisfy the following requirements: (1) the employee must work a total of one year (defined as 1,000 hours during the plan year) for the employer before the commencement of the plan year, and (2) the employee must be at least 25 years of age at the time of entry into the plan. Once the eligibility requirements are met, an eligible employee will become a plan participant upon the last to occur of the following events: (1) the qualifying employer of the eligible employee has become a covered employer; (2) the underwriter issues a policy of insurance on the life of the eligible employee; (3) the eligible employee is assigned a rating group by the committee and notice of the assignment is sent to the employer by the third-party administrator; (4) the employer pays its contribution to the plan with respect to all eligible

employees/participants of the employer; and (5) all insurance on the employer's eligible employee/participants and the fixed contribution of the covered employer are received by the trustee.

The master plan for the Millennium plan also provides that if, for any reason, no policy of insurance is issued by an underwriter on any eligible employee of a covered employer or no rating group assignment is made on any eligible employee of the covered employer, then any contribution made by the covered employer to the plan and/or trustee shall be refunded to the covered employer, minus the administration fee identified in the adoption agreement. Additionally, a covered employer may terminate participation in the plan and the fixed life benefits of the participants will be paid or transferred to a trust under section 419(e). Triggering events for the payment of fixed benefits include the death of a participant, a participant's termination of employment with the covered employer, termination of the participant's participation by the third-party administrator, withdrawal of the covered employer from the plan, or termination of the plan.

Although Mr. Cline was the only person Dr. White spoke to about transferring to the Millennium plan, Dr. White, as president of Diogenes, signed the adoption agreement for the Millennium plan effective July 11, 2003.

Even though Eric was only 19 years old at the time of the effective date of the adoption agreement, exhibit B to the agreement provided that the following employees of Diogenes were eligible to participate in the Millennium plan:

| Name | Date of birth |
|------|---------------|
| Dr. White | 11/7/1945 |
| Mrs. White | 3/14/1951 |
| Margaret | 9/6/1964 |
| Eric | 5/12/1984 |

Neither Eric nor Margaret worked the requisite 1,000 hours for Diogenes and neither of them received a salary from Diogenes in 2003.

Although it was indicated in the adoption agreement that Diogenes elected to make fixed, annual contributions of $175,327 for class 1 employees (president), $23,649 for class 2 employees (office manager), and $979 for class 3 employees (nonmanagement), Dr. and Mrs. White did not intend that Diogenes would make more than one final payment on each of the insurance policies in the amounts set forth in the adoption agreement.

Diogenes acknowledged and warranted that it had not relied upon any legal or tax advice of the sponsor, the committee, the third-party administrator, the underwriter, the trustee, or any agent of these, in executing the adoption agreement. In fact, Diogenes elected not to seek an individualized legal opinion

pertaining to the Federal tax issues that may have arisen from participation in the Millennium plan.

On August 27, 2003, Sonya Siqueira and L. Donald Guess, on behalf of xélan, signed the Transfer of Ownership documents for the insurance policies for Dr. and Mrs. White, Margaret, and Eric. On September 23, 2003, a representative of Republic Bank signed the Transfer of Ownership documents for Dr. and Mrs. White, Margaret, and Eric. On October 3, 2003, a representative of Indianapolis Life signed the Transfer of Ownership documents for Dr. and Mrs. White, Margaret, and Eric.

On November 28, 2003, Diogenes issued a $199,999.51 check payable to the Millennium plan. The check was used to pay premiums on Dr. and Mrs. White's, Margaret's, and Eric's insurance policies as follows:

| Name | Amount |
| --- | --- |
| Jerald White | $175,326.69 |
| Claudia White | 23,693.82 |
| Margaret White | 423.00 |
| Eric White | 556.00 |

However, by letter dated April 21, 2006, and signed by Ms. Barrow, the Millennium plan notified Dr. White that both his and Mrs. White's Indianapolis Life polices remained in extended term insurance mode because their insurance producer,

Mr. Cline, had not submitted the paperwork necessary to cause the annual costs of the policies to be paid out of the policies' cash values after the fifth year. The letter further instructed Dr. and Mrs. White that if they were to complete the reinstatement paperwork provided by the Millennium plan trustee, then the life insurance policies would be reinstated to the form at which they were originally issued and would perform as illustrated when purchased in connection with their participation with xélan. Ms. Barrow also notified Dr. White that he could still void the transaction with respect to the Millennium plan. If the transaction was void, the contributed insurance policies would be returned.

Dr. and Mrs. White and Diogenes Join a Lawsuit Against Indianapolis Life and Mr. Cline

On October 20, 2006, John B. Phillips, Catherine T. Phillips, and Phillips Management, Inc., filed a complaint for damages against Indianapolis Life and Mr. Cline in the U.S. District Court for the Southern District of Indiana, Indianapolis Division (lawsuit). On November 20, 2006, Dr. and Mrs. White and Diogenes, along with nine other plaintiffs, joined the lawsuit against Indianapolis Life and Mr. Cline.

In the lawsuit the plaintiffs accused Indianapolis Life and Mr. Cline of fraud, negligent misrepresentation, breach of common law fiduciary duty, and breach of

insurers' duty of good faith with respect to their role in the promotion, marketing, and participation in employee benefit plans funded with life insurance. Dr. and Mrs. White's and Diogenes' prayer for relief included compensatory and punitive damages, rescission of the insurance policies and a return of their premiums, interest, costs, and other amounts.

## OPINION

Pursuant to section 7491(a), petitioners have the burden of proof unless they introduce credible evidence relating to the issue that would shift the burden to respondent. See Rule 142(a). Our conclusions, however, are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998).

Section 419(a) generally provides that an employer's contributions paid or accrued to a welfare benefit fund are deductible, but only if they are otherwise deductible under chapter 1 of the Code. Section 419(b) further limits the deductibility of an employer's contributions to a welfare benefit fund to the fund's qualified cost for the taxable year. Section 419A(f)(6), however, provides that contributions paid by an employer to a multiple-employer welfare benefit fund are not subject to the deduction limitation of section 419(b).

Ordinary and Necessary Business Expenses

In general, section 162(a) provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  There are five requirements a taxpayer must meet in order to deduct an item under this section.  "The taxpayer must prove that the item claimed as a deductible business expense:  (1) Was paid or incurred during the taxable year; (2) was for carrying on his, her, or its trade or business; (3) was an expense; (4) was a necessary expense; and (5) was an ordinary expense." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 88 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).  A determination of whether an expenditure satisfies each of these requirements is a question of fact.  See Commissioner v. Heininger, 320 U.S. 467, 475 (1943).

Petitioners argue that Diogenes' contributions to the xélan 419 plan and the Millennium plan satisfy the requirements of section 162 and are thus deductible under section 162(a).  Petitioners contend that the contributions were paid to a fund for the benefit of employees, were intended to only directly benefit the employees, and were paid in amounts reasonably based upon the services the company expected to receive from its employees.

Respondent argues that although employers are generally not prohibited from funding term life insurance for employees and deducting the premiums paid as business expenses under section 162(a), employers are not allowed to disguise investments in life insurance as deductible benefit-plan expenses when the investments accumulate cash value for the employees personally.

Section 162(a)(1) specifies that a deduction for ordinary and necessary business expenses includes "a reasonable allowance for salaries or other compensation for personal services actually rendered".  Where, as here, the case involves a closely held corporation with the controlling shareholders setting their own level of compensation as employees, the reasonableness of the compensation is subject to close scrutiny.  Devine Bros., Inc. v. Commissioner, T.C. Memo. 2003-15 (citing Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1324 (5th Cir. 1987), aff'g T.C. Memo. 1985-267).

We have found that contributions to plans similar to the xélan 419 plan and the Millennium plan were not deductible under section 162(a) in at least four previous cases:  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, V.R. DeAngelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360, aff'd per curiam, 574 F.3d 789 (2d Cir. 2009), Curcio v. Commissioner, T.C. Memo. 2010-115, and Goyak v. Commissioner, T.C. Memo. 2012-13.

In Neonatology, Neonatology Associates deducted contributions to a voluntary employee's beneficiary association (VEBA) to provide life insurance for its employees. Neonatology Associates substantially overpaid the VEBA for term life insurance, and the Court found "incredible petitioners' assertion that the employee/owners of Neonatology * * * would have caused their respective corporations to overpay substantially for term life insurance with no promise or expectation of receiving the excess contributions back." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 89. Because the plan participants could retrieve their policies from the plan, the Court concluded that "the purpose and operation of the Neonatology Plan * * * was to serve as a tax-free savings device for the owner/employees and not, as asserted by petitioners, to provide solely term life insurance to the covered employees." Id. at 92. The portions of the contribution that exceeded the cost of term life insurance were found to be "nondeductible distributions of cash for the benefit of their employee/owners and do not constitute ordinary or necessary business expenses." Id. at 88-89.

In V.R. DeAngelis M.D.P.C., a partnership named VRD/RTD enrolled in what purported to be a multiple-employer supplemental benefit plan and trust (STEP). The STEP was supposed to provide eligible employees with severance, and, if elected, life insurance benefits. Each year the partnership deducted the full

amount of its contribution to the plan in that year as an ordinary and necessary business expense under section 162(a), and the plan invested the contributions in whole life insurance policies that accumulated cash for the doctors personally. The Court found that

> The insurance premiums at hand pertained to the participating doctors' personal investments in whole life insurance policies that primarily accumulated cash value for those doctors personally. * * *

> The use of whole life insurance policies and the direct interactions between the participating doctors and the STEP plan representatives support our finding that the participating doctors in their individual capacities fully expected to get their promised benefits and that any receipt of those benefits was not considered by anyone connected with the life insurance transaction to rest on any unexpected or contingent event. Each whole life insurance policy upon its issuance was in and of itself a separate account of the insured doctor, and the insured (rather than the STEP plan) dictated and directed the funding and management of the account and bore most risks incidental to the account's performance. The STEP plan in essence and in operation was simply an aggregation of separate plans for the participating doctors and not, as petitioners claim, one single plan in which various employers participated. * * *

V.R. DeAngelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360. The Court concluded that the contributions by VRD/RTD to the STEP plan were distributions to the partners and were not ordinary and necessary business expenses under section 162(a).

The facts in these cases are similar to those of <u>Neonatology</u> and <u>V.R. DeAngelis M.D.P.C.</u>  The Indianapolis Life policies purchased with the contributions to the xélan 419 plan in 2001 and 2002 and to the Millennium plan in 2003 were nothing more than Dr. and Mrs. White's personal investment in whole life insurance policies that primarily accumulated cash value for Dr. and Mrs. White personally. Dr. White worked with Mr. Cline to develop an investment amount and strategy that was suitable to Dr. White.  Dr. White determined the amount of contribution and coverage for himself, his spouse, and his children.  Moreover, Dr. and Mrs. White believed that the investment would be "tax free in, tax free out".  Dr. White knew the investment was into a cash value life insurance product and expected that, in addition to tax savings, his after-tax return on investment would equal or exceed the amount that would have to be contributed.  The cash value of the insurance policies was suppressed during the initial years with high surrender charges.  In 2003 when the xélan 419 plan terminated the "cash value" of the policies was approximately $127,000 but the total "accumulation value" was $642,220.87.[8]  Dr. White's decision to transfer the policies to the Millennium plan after the termination of the

---

[8]<u>See</u> <u>supra</u> note 4 and <u>infra</u> p. 52.

xélan 419 plan was to continue his original investment plan in order to "salvage the $800 thousand that  * * * [he] had already pumped into Xélan."

The xélan 419 plan permitted the employer (Diogenes) to terminate its participation and to withdraw from the plan at any time.  Upon termination, the underlying insurance policies could be distributed to the participating employees. Dr. White had complete control over Diogenes and thus had the ability to cause the policies to be distributed.

In 2003 when the xélan 419 plan terminated, Dr. White was presented with the option of receiving the policies by "purchasing" the policies or transferring them to Millennium.  He was told that if he chose to purchase the policies he would have to pay the xélan 419 plan approximately $43,000, but that the $43,000 would be returned to him.  Since by then Dr. White no longer trusted xélan, he chose to have the policies transferred to Millennium.

The Millennium plan was selected by Dr. White to continue his original investment plan, and its operation was similar to that of the xélan 419 plan.  While there were subtle differences in the insureds' ability to have the underlying insurance policies distributed to them upon the employer's termination of participation, it is clear from the record that Millennium, at least through 2006, was willing to allow Dr.

White and Diogenes to "void" their participation in the Millennium plan and have the underlying insurance policies returned to them.

In Curcio v. Commissioner, T.C. Memo. 2010-115, and Goyak v. Commissioner, T.C. Memo. 2012-13, our decisions were largely based on the conclusion that the individual insureds always had the ability to receive the value of the underlying insurance policies purchased by the respective plans. Likewise, Dr. White had the ability to cause the policies to be distributed in these cases.

After considering the facts and weighing the evidence, we conclude, as we did in the previously cited cases, that Diogenes' contributions to the xélan 419 plan in 2001 and 2002 and to the Millennium plan in 2003 were payments on behalf of Dr. and Mrs. White personally and were not ordinary and necessary business expenses. Because of our holding it is unnecessary for us to decide whether the contributions were subject to and limited by the rules of section 404(a)(5) or whether the arrangement was a welfare benefit fund to which the exceptions under section 419A(f)(6) apply.[9] See Neonatology Assocs., P.A. v. Commissioner, 115 T.C.

---

[9]Although Diogenes may arguably be entitled to deduct the costs of current life insurance protection for term life insurance, see Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002), petitioners have not requested any such deductions.

43; V.R. DeAngelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360.

Constructive Dividends

Section 61(a) generally provides: "gross income means all income from whatever source derived". The regulations under section 61 further provide that gross income "includes income realized in any form, whether in money, property, or services." Sec. 1.61-1(a), Income Tax Regs. However, section 301 provides that funds (or any other property) distributed by a corporation to a shareholder over which the shareholder has dominion and control are to be taxed under the provisions of section 301(c).

"Under section 301(c), a constructive distribution is taxable to the shareholder as a dividend only to the extent of the corporation's earnings and profits." Barnard v. Commissioner, T.C. Memo. 2001-242. Any portion of the constructive distribution that exceeds the corporation's earnings and profits is a nontaxable return of capital to the extent of the shareholder's basis in the corporation, and any remaining amount is taxable to the shareholder as long-term capital gain. Sec. 301(c)(2) and (3); Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987).

Diogenes was incorporated in 1999. Dr. White was the 100% owner and only shareholder of Diogenes. Diogenes' contributions to the xélan 419 plan in 2001 and 2002 and to the Millennium plan in 2003 conferred an economic benefit on Dr. and Mrs. White. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 91. The $200,000 annual contributions are constructive distributions of cash rather than payments of ordinary and necessary business expenses, and there is no indication that Diogenes expected any repayment of the cash underlying the conferred benefit. See id.

The record supports the conclusion that after disallowing the deductions for its "contributions" to the xélan and Millennium plans, Diogenes had earnings and profits of at least $200,000 during each of the years in issue, and petitioners have not challenged respondent's determination that Diogenes had sufficient earnings and profits to characterize the subject distributions as dividends. Rather, petitioners assert that the Court need not consider the discussion because petitioners believe that Diogenes' contributions to xélan 419 plan in 2001 and 2002 and to the Millennium plan in 2003 were ordinary and necessary business expenses. We have already held that the subject contributions were not ordinary and necessary business expenses. Accordingly, we sustain respondent's determination that the distributions are taxable dividends to Dr. White. See Rule

142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Because of our holding, it is unnecessary for us to reach the alternative arguments raised with respect to this issue.

Constructive Receipt of the Indianapolis Life Policies in 2003

Respondent determined that Dr. and Mrs. White received income of $642,220 in 2003 when the insurance policies purchased by the xélan 419 plan became available to them as a result of the termination of the xélan 419 plan. Respondent calculated those values in accordance with Rev. Proc. 2005-25, 2005-1 C.B. 962. This is the same as the "accumulated value" reported by Indianapolis Life.

Petitioners argue that they transferred from one welfare benefit plan to another, that both plans provided for similar benefits with similar restrictions on forfeiture and reversion of plan assets, and that Dr. and Mrs. White never had ownership, possession, or control of plan benefits either before or after the transfer.

Respondent relies on section 402(b)(2), which provides that "The amount actually distributed or made available to any distributee by any trust described in paragraph (1) [a nonexempt trust] shall be taxable to the distributee, in the taxable year in which so distributed or made available, under section 72".

Under section 72 any amount which is received under a life insurance contract and which is not received as an annuity shall be included in gross income to the extent it exceeds the investment in the contract. Sec. 72(e)(1)(A), (5)(A), (C), (E)(ii). The investment in the contract is defined generally as the aggregate amount of premiums or other consideration paid for the contract less amounts previously received under the contract, to the extent such latter amounts were excludable from gross income. Sec. 72(e)(6).[10] Respondent cites no court opinions to support his position, and this issue appears to be one of first impression.

On May 29, 2003, Dr. and Mrs. White were notified that the xélan 419 plan was terminating and they were asked what they wanted to do with the Indianapolis Life policies. One of the options provided to Dr. and Mrs. White was to acquire the policies at no net cost to them other than the possible ensuing tax consequences. The up-front, out-of-pocket cost to acquire these two policies would have been

---

[10]Respondent calculated the value of the insurance contracts pursuant to Rev. Proc. 2005-25, 2005-1 C.B. 962. Petitioners have not contested respondent's method of computing the values of the insurance contracts using a variable premiums, earnings, and reasonable charges amount. See id. On brief respondent acknowledges that if the Court were to determine that the contributions to the xélan 419 plan in 2001 and 2002 are taxable income to Dr. and Mrs. White, then the income inclusion for premiums paid in 2001 and 2002 will create investment in the contract.

$51,176.48; however, as Dr. and Mrs. White had been informed, that amount or more would have been returned to them as a redistribution of assets within 90 days along with their insurance contracts. As of June 30, 2003, the total accumulation value of Dr. and Mrs. White's Indianapolis Life policies was $642,220.87.

Under the annual accounting system of taxation, the amount of income for a taxable year is generally determined on the basis of triggering events during that year. Goyak v. Commissioner, T.C. Memo. 2012-13; see also Curcio v. Commissioner, T.C. Memo. 2010-115. A taxable event usually occurs when a taxpayer acquires rights to property that he did not previously have. Respondent's section 402(b)(2) argument is that a taxable event occurred when the xélan 419 plan terminated in 2003 and the underlying insurance policies were made available for distribution to Dr. and Mrs. White.

We have already determined that Diogenes' payments to the xélan 419 plan were not deductible and that they constitute dividend income to Dr. and Mrs. White. This was based in part on our finding that Dr. and Mrs. White always had the ability to terminate Diogenes' participation in the xélan 419 plan, which would have resulted in the distribution of the Indianapolis Life policies to Dr. and Mrs. White. Thus, the policies were always available for distribution. The taxable event

that respondent argues occurred in 2003 gave Dr. and Mrs. White nothing in addition to what they always possessed; i.e., the power to have the policies distributed to them.[11] Under these circumstances, we cannot agree that the termination of the xélan 419 plan was a taxable event.[12] We therefore reject respondent's position that Dr. and Mrs. White received income of $642,220.87 when the xélan 419 plan terminated in 2003.

Accuracy-Related Penalty

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return attributable to a taxpayer's negligence or disregard of rules or regulations, or any substantial understatement of income tax.

Section 7491(c) provides that the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence

---

[11]Indeed, respondent argued on brief that the xélan 419 Plan was merely a conduit through which Dr. and Mrs. White held the insurance policies.

[12]Other than arguing that the termination of the xélan 419 plan in 2003 triggered the application of sec. 402(b)(2), resulting in a $642,220.87 increase in income with a possible adjustment for basis, respondent made no alternative arguments or calculations. See Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat, 289 F.3d 434, 441 (6th Cir. 2002) (undeveloped legal arguments waived); Muhich v. Commissioner, 238 F.3d 860, 864 n.10 (7th Cir. 2001), aff'g T.C. Memo. 1999-192.

indicating that it is appropriate to impose the penalty.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once the Commissioner meets his burden of production, however, the burden of proof remains with the taxpayer, including the burden of proving that the penalty is inappropriate because of reasonable cause or substantial authority under section 6664.  See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.

Respondent has met his burden of production in that he has shown that Dr. and Mrs. White caused Diogenes to improperly deduct hundreds of thousands of dollars used to purchase cash-accumulating whole life insurance policies which could later be distributed to Dr. and Mrs. White for free or for a small fraction of the value of the insurance policy.  This is sufficient to indicate that it is appropriate to impose penalties under section 6662(a).  See Curcio v. Commissioner, T.C. Memo. 2010-115.

There is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year, or $5,000.  Sec. 6662(d)(1)(A).  However, in the case of a corporation other than an S corporation or a personal holding company (as defined in section 542), there is a substantial understatement of income tax for any taxable year if the amount of the

understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return for the taxable year, or $10,000.  Sec. 6662(d)(1)(B).

The understatements of tax on both Dr. and Mrs. White's Federal income tax returns and on Diogenes' corporate tax returns are substantial.  Petitioners, however, argue that they had both reasonable cause and substantial authority for the deduction of contributions to the xélan 419 plan and the Millennium plan.

Reasonable Cause

"Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item."  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98.  The good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement.  See id. (citing United States v. Boyle, 469 U.S. 241 (1985)); sec. 1.6664-4(b), Income Tax Regs.  Reliance on an opinion or advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances.  Sec. 1.6664-4(c)(1)(i), Income Tax Regs.

To be reasonable, the professional tax advice must generally be from a competent and independent adviser unburdened with a conflict of interest and not from promoters of the investment.  Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), aff'g T.C. Memo. 2004-279.  "Courts have routinely held that

taxpayers could not reasonably rely on the advice of promoters or other advisers with an inherent conflict of interest such as one who financially benefits from the transaction." Tigers Eye Trading, L.L.C. v. Commissioner, T.C. Memo. 2009-121 (citing Hansen v. Commissioner, 471 F.3d 1021, 1031 (9th Cir. 2006) ("a taxpayer cannot negate the negligence penalty through reliance on a transaction's promoters or on other advisors who have a conflict of interest"), aff'g T.C. Memo. 2004-269, Van Scoten v. Commissioner, 439 F.3d 1243, 1253 (10th Cir. 2006) ("To be reasonable, the professional adviser cannot be directly affiliated with the promoter; instead, he must be more independent"), aff'g T.C. Memo. 2004-275, Barlow v. Commissioner, 301 F.3d 714, 723 (6th Cir. 2002) (noting "that courts have found that a taxpayer is negligent if he puts his faith in a scheme that, on its face, offers improbably high tax advantages, without obtaining an objective, independent opinion on its validity"), aff'g T.C. Memo. 2000-339; Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994) (taxpayer could not reasonably rely on professional advice of someone known to be burdened with an inherent conflict of interest--a sales representative of the transaction), aff'g T.C. Memo. 1993-480, Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993) (reliance on promoters or their agents is unreasonable because such persons are not independent of the investment), aff'g Donahue v. Commissioner, T.C. Memo.

991-181, and <u>Illes v. Commissioner</u>, 982 F.2d 163, 166 (6th Cir. 1992) (finding negligence where taxpayer relied on a person with financial interest in the venture), <u>aff'g</u> T.C. Memo. 1991-449). "A promoter's self-interest makes such 'advice' inherently unreliable." <u>Id.</u>

Petitioners did not seek independent advice regarding the deductibility of the contributions to the xélan 419 plan or the Millennium plan; rather, they relied on the advice of Mr. Cline and Mr. Lloyd. Mr. Cline was associated with xélan and involved in promoting the xélan 419 plan for his personal benefit and gains. As to Mr. Lloyd, petitioners did not hire him nor pay for the opinion letter he wrote; rather, xélan did. The opinion letter stated that Mr. Lloyd's law firm, Williams Coulson, had been engaged by xélan to prepare the opinion letter, that it was directed solely to xélan, and that it could be relied upon solely by xélan.

When the xélan 419 plan terminated and the Indianapolis Life policies were made available to Dr. and Mrs. White, the only person they consulted was Mr. Cline. Mr. Cline's advice was relied upon by Dr. and Mrs. White in choosing to transfer the policies to the Millennium plan in 2003. In fact, it was not until August 2004 that petitioners received the administration manual containing the Millennium plan documents.

Accordingly, we hold that petitioners did not act with reasonable cause and in good faith when they entered into the xélan 419 plan and the Millennium plan relying primarily, if not solely, upon the advice of promoters and other interested parties that stood to benefit financially from the transactions.

Substantial Authority

The amount of an understatement is reduced by that portion of the understatement which is attributable to: (1) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (2) the taxpayer's adequately disclosing relevant facts in the return or in a statement attached to the return, with a reasonable basis for the tax treatment of such item by the taxpayer. Sec. 6662(d)(2)(B).

"In evaluating whether a taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions." Antonides v. Commissioner, 91 T.C. 686, 702 (1988), aff'd, 893 F.2d 656 (4th Cir. 1990); see also sec. 1.6662-4(d)(3)(i), Income Tax Regs. The substantial authority standard is objective and, therefore, it is not relevant in determining whether the taxpayer believed substantial authority existed. Sec. 1.6662-4(d)(3)(i), Income Tax Regs.

In Booth v. Commissioner, 108 T.C. 524, 578 (1997), we stated that although legal opinions are not authority, the "authorities underlying a legal opinion, however, may give rise to substantial authority for the tax treatment of an item." Section 1.6662-4(d)(3)(iii), Income Tax Regs., provides that only the following are authority for purposes determining whether there is substantial authority for the tax treatment of an item:

> [A]pplicable provisions of the Internal Revenue Code and other statutory provisions; proposed, temporary and final regulations construing such statutes; revenue rulings and revenue procedures; tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; court cases; congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers; General Explanations of tax legislation prepared by the Joint Committee on Taxation (the Blue Book); private letter rulings and technical advice memoranda issued after October 31, 1976; actions on decisions and general counsel memoranda issued after March 12, 1981 (as well as general counsel memoranda published in pre-1955 volumes of the Cumulative Bulletin); Internal Revenue Service information or press releases; and notices, announcements and other administrative pronouncements published by the Service in the Internal Revenue Bulletin. * * *

In 1999 when Dr. and Mrs. White and Diogenes began their participation in the xélan 419 plan, the Court had issued Booth v. Commissioner, 108 T.C. 524 (1997), and the IRS had issued Notice 95-34, 1995-1 C.B. 309. In Booth the Court did not impose an accuracy-related penalty because the question of whether

the Prime Plan was within the scope of section 419A(f)(6) was at the time a novel question. In Notice 95-34 the IRS provided guidance on the tax problems raised by certain trust arrangements in seeking to qualify for exemption from section 419. Furthermore, before any of the years at issue, this Court issued <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43. We therefore conclude that there was not substantial authority supporting the deductions for the contributions to either the xélan 419 plan or the Millennium plan.

In reaching our decision, we have considered all arguments made by the parties. To the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155 in docket No. 22514-07 and for respondent in docket No. 22515-07</u>.